1  ALLAN E. ANDERSON (SBN 133672)
   JERROLD ABELES (SBN 138464)
2  **ARENT FOX LLP**
   555 West Fifth Street, 48th Floor
3  Los Angeles, CA  90013-1065
   Telephone:    213.629.7400
4  Facsimile:    213.629.7401
   Email:        allan.anderson@arentfox.com
5  Email:        jerry.abeles@arentfox.com

6  ARNOLD E. SKLAR (SBN 51595)
   ALAN J. HART (SBN 278645)
7  **ROPERS, MAJESKI, KOHN & BENTLEY**
   515 South Flower Street, Suite 1100
8  Los Angeles, CA  90071-2213
   Telephone:    213.312.2000
9  Facsimile:    213.312.2001
   Email:        asklar@rmkb.com
10 Email:        ahart@rmkp.com

11 Attorneys for Defendants
   UNDER ARMOUR, INC.; FINISH LINE,
12 INC.; FOOT LOCKER, INC.;
   NORDSTROM, INC.; DICK'S SPORTING
13 GOODS, INC.; CHAMPS SPORTS; SPORT
   CHALET, INC.; ZAPPOS IP, INC.;
14 BACKCOUNTRY.COM, INC.; ROGANS
   SHOES, INC.; ROAD RUNNER SPORTS
15 RETAIL, INC.; MONKEYSPORTS, INC.;
   HOLABIRD SPORTS, LLC; EASTBAY,
16 INC.

17              UNITED STATES DISTRICT COURT

18              CENTRAL DISTRICT OF CALIFORNIA

19

20 GRAVITY DEFYER                  Case No.  CV13-01842 JAK (JCGx)
   CORPORATION, a California
21 corporation,                    **NOTICE OF MOTION AND
                                   MOTION FOR SUMMARY
22          Plaintiff,             JUDGMENT OR IN THE
                                   ALTERNATIVE PARTIAL
23 v.                              SUMMARY JUDGMENT**

24 UNDER ARMOUR, INC., a           Date:      June 23, 2014
   Maryland corporation; et al.,   Time:      8:30 a.m.
25                                 Place:     Courtroom 750
            Defendants.
26

27

28

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE THAT on June 23, 2014, at 8:30 a.m. in Courtroom 750, located at 255 E. Temple Street, Los Angeles, CA, Defendants Under Armour, Inc.; Finish Line, Inc.; Footlocker, Inc.; Nordstrom, Inc.; Dick's Sporting Goods, Inc.; Champs Sports; Sport Chalet, Inc.; Zappos IP, Inc.; Backcountry.com, Inc.; Rogans Shoes, Inc.; Road Runner Sports Retail, Inc.; Monkeysports, Inc.; Holabird Sports, LLC; and Eastbay, Inc. will, and hereby do, move for summary judgment in their favor, or in the alternative partial summary judgment in their favor. This motion is based on the fact that Plaintiff Gravity Defyer Corporation is unable to establish a likelihood of confusion, a necessary element of each of its claims. Nor can Plaintiff establish that any Under Armour product uses Plaintiff's trademark either as a standalone mark or other than in conjunction with Under Armour's own trademarks. Further, Plaintiff cannot establish that it has any level of consumer recognition such that it can establish confusion.

The motion is based on this Notice of Motion and Motion, the accompanying Request for Judicial Notice and Declarations of Benjamin Schoonover, William Besselman, and Allan Anderson, the lodged [Proposed] Order, [Proposed] Statement of Uncontroverted Facts and Conclusions of Law, and [Proposed] Judgment, and such further evidence, briefing, and argument presented prior to or at the hearing on this motion. The motion is made following the conference of counsel pursuant to Local Rule 7-3, which took place on January 30, 2014.

1

Dated:   April 22, 2014                    **ARENT FOX LLP**

2

3                                          By: /s/ Jerrold Abeles
                                           _____
4                                          ALLAN E. ANDERSON
                                           JERROLD ABELES

5                                          Attorneys for Defendants
                                           UNDER ARMOUR, INC.; FINISH LINE, INC.;
6                                          FOOT LOCKER, INC.; NORDSTROM, INC.;
                                           DICK'S SPORTING GOODS, INC.; CHAMPS
7                                          SPORTS; SPORT CHALET, INC.; ZAPPOS IP,
                                           INC.; BACKCOUNTRY.COM, INC.; ROGANS
8                                          SHOES, INC.; ROAD RUNNER SPORTS
                                           RETAIL, INC.; MONKEYSPORTS, INC.;
9                                          HOLABIRD SPORTS, LLC; EASTBAY, INC.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................................. 1

II. STATEMENT OF FACTS .................................................................................. 2

 A. Plaintiff's Mark and Products ....................................................................... 2

 B. Under Armour's Marks and Products ............................................................ 3

 C. Involvement by Other Defendants ................................................................ 4

 D. "Defy" is a Commonly Used Mark in the Footwear and Clothing Industries ........ 4

 E. Surveys Show that 98%-99% of Consumers Have Never Even Heard of Plaintiff or Plaintiff's Products ........................................................................ 5

 F. Plaintiff's Claims Arise Exclusively from Alleged Results of Internet Searches for "G Defy" ................................................................................... 6

III. STANDARD FOR SUMMARY JUDGMENT .................................................. 8

IV. ARGUMENTS ..................................................................................................... 9

 A. Issues To Be Decided ................................................................................... 9

 B. Defendants Do Not Use Plaintiff's Mark or a Similar Mark ...................... 9

 C. Plaintiff Cannot Establish A Likelihood of Confusion ............................ 11

  1. The pertinent Sleekcraft factors confirm that there is no likelihood of confusion ............................................................................................ 11

   a. Plaintiff's mark is weak ............................................................. 13

   b. There is no evidence of actual confusion ................................... 14

   c. Given the specialized goods offered by Plaintiff, purchasers are likely to exercise a high degree of care ................................... 15

   d. There is no likelihood that consumers could be confused when presented with the clearly labeled search results ................ 17

  2. Any initial interest confusion does not result in liability for Defendants ................................................................................................ 18

V.  CONCLUSION .................................................................................................. 23

# TABLE OF AUTHORITIES

Page

CASES

*1-800 Contacts, Inc. v. Lens.com, Inc.,*
   755 F. Supp. 2d 1151 (D. Utah 2010) ......................................................... passim

*AMF Inc. v. Sleekcraft Boats,*
   599 F.2d 341 (9th Cir. 1979) .......................................................................... 11, 12

*Brockmeyer v. Hearst Publishing Corp.,*
   248 F.Supp.2d 281 (S.D.N.Y. 2003) ................................................................. 22

*Carefirst of Maryland, Inc. v. First Care, P.C.,*
   434 F.3d 263 (4th Cir. 2006) ............................................................................. 22

*Dreamwerks Productions Group, Inc., v. SKG Studio,*
   142 F.3d 1127 (9th Cir. 1998) ........................................................................... 12

*FragranceNet.com, Inc. v. Les Parfums, Inc.,*
   672 F. Supp. 2d 328 (E.D.N.Y. 2009) ................................................................. 5

*Fuji Jyukogyo Kabushiki Kaisha v. Toyota Jidosha Kabushiki Kaisha,*
   228 U.S.P.Q. 672 (TTAB 1985) ......................................................................... 11

*Glow Industries, Inc. v. Lopez,*
   273 F.Supp.2d 1095 (C.D. Cal. 2003) ............................................................... 13

*Halo Management, LLC, v. Interland, Inc.,*
   308 F.Supp.2d 1019 (N.D. Cal. 2003) ............................................................... 13

*IDV North America v. S&M Brands, Inc.,*
   26 F.Supp.2d 815 (E.D. Va. 1998) ..................................................................... 22

*Levi Strauss & Co., v. Blue Bell, Inc.,*
   778 F.2d 1352 (9th Cir. 1985) ........................................................................... 13

*Marker Int'l v. deBruler,*
   635 F.Supp. 986 (D.Utah 1986), *aff'd* 844 F.2d 763 (10th Cir. 1988) ................... 11

*Miss World (UK) Ltd. v. Mrs. America Pageants,*
   856 F.2d 1445 (9th Cir. 1988) ........................................................................... 13

*Network Automation, Inc. v. Advanced Systems Concepts, Inc.,*
   638 F.3d 1137 (9th Cir. 2011) ..................................................................... passim

*Nissan Motor Co. v. Nissan Computer Co.,*
   378 F.3d 1002 (9th Cir. 2004) ........................................................................... 19

## TABLE OF AUTHORITIES

Page

*Nora Beverages v. Perrier Group of America,*
269 F.3d 114 (2d Cir. 2001)........................................................................ 10, 14, 15, 19

*Nutri/Sys., Inc. v. Con-Stan Indus., Inc.,*
809 F.2d 601 (9th Cir. 1987)........................................................................ 14

*Philip Morris USA Inc. v. Liu,*
489 F.Supp.2d 1119 (C.D. Cal. 2007)........................................................................ 9

*Playboy Enters., Inc. v. Netscape Commc'ns Corp.,*
354 F.3d 1020 (9th Cir. 2004)........................................................................ 18, 19, 20

*Rearden LLC v. Rearden Commerce, Inc.,*
683 F.3d 1190 (9th Cir. 2012)........................................................................ 12

*Sand Hill Advisors, LLC v. Sand Hill Advisors, LLC,*
680 F. Supp. 2d 1107 (N.D. Cal. 2010) ........................................................................ 9, 13

*Sara Lee v. Kayser-Roth Corp.,*
81 F.3d 455 (4th Cir.1996)........................................................................ 22

*Savin Corp. v. Savin Group,*
391 F.3d 439 (2d Cir. 2004)........................................................................ 11

*Universal City Studios, Inc. v. Nintendo Co., Ltd.,*
746 F.2d 112 (2d Cir. 1984)........................................................................ 11

*Universal Money Centers, Inc. v. American Tel. & Tel. Co.,*
22 F.3d 1527 (10th Cir. 1994)........................................................................ 14

*Walter v. Mattel, Inc.,*
210 F.3d 1108 (9th Cir. 2000)........................................................................ 10, 12, 19

**STATUTES**

15 U.S.C. § 1114 ........................................................................ 9

**OTHER AUTHORITIES**

Fed.R.Civ.Proc. 56(c) ........................................................................ 8

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- iii -

CV13-01842 JAK (JCGX)
DEFS' MOT FOR SUMM JUDGMENT

1    Defendants move for summary judgment on Plaintiff Gravity Defyer
2    Corporation's Second Amended Complaint.

3    **I.     INTRODUCTION**

4           This trademark infringement case involves brand names used on footwear
5    that Plaintiff claims are so similar that they cause consumer confusion.  But the
6    uncontroverted evidence shows that consumer familiarity with Plaintiff's brand is
7    virtually non-existent, and Plaintiff's products are so specialized, that confusion not
8    only does not exist, but is not likely to exist.

9           Plaintiff Gravity Defyer owns and uses the federally registered trademark G
10   Defy® to sell specialized footwear with springs in the heals.

11          Defendant Under Armour sells athletic shoes that incorporate "Micro G"
12   technology.  These shoes bear Under Armour's Micro G® federally registered
13   trademark, and have multiple style or model names, one of which was "Defy."
14   Combining its famous house mark (Under Armour and/or UA), its footwear
15   technology name (Micro G), and the designated style name (Defy), the complete
16   name of the product at issue is the Under Armour Micro G® Defy running shoes.
17   The other moving Defendants are online or retail outlets for Under Armour shoes.

18          This is not a case where Under Armour added its "house mark" to Plaintiff's
19   mark:  there is no "Under Armour G Defy" shoe.  Rather, the only way that
20   Plaintiff can establish Under Armour's "use" of the G Defy mark is to
21   impermissibly parse the "G" from UA's Micro G® mark and attach it to the Defy
22   style, in a manner never performed by Under Armour.

23          Plaintiff claims that consumer confusion exists when the term "G Defy" is
24   used as an internet search term, for both Plaintiff's G Defy products and Under
25   Armour Micro G Defy shoes appear on the search results page.  For this reason
26   alone, Plaintiff asserts claims for trademark infringement and unfair competition.

27          Plaintiff's claims fail for several factual and legal reasons.  First, Plaintiff is
28   unable to establish a likelihood of confusion among consumers, an essential

1    element of both of its claims.  No Under Armour product was ever identified as

2    anything other than an Under Armour product.

3         Second, Plaintiff's own evidence confirms that Plaintiff's products, not

4    Under Armour's, appear in the first several search results.  As a result, any

5    consumer who knows enough about Plaintiff's products to perform a focused

6    search for "G Defy" is actually directed to Plaintiff's website.  Under these

7    circumstances, it is not surprising that Plaintiff has no evidence that anyone was

8    ever confused by the search results.

9         Third, survey results confirm that consumer recognition of Plaintiff's

10   products is so low (less than 2%) that, as a matter of law, confusion cannot be

11   established.

12        The Court may, without a fact-intensive inquiry and as a matter of law, find

13   that there is no likelihood of consumer confusion.  As Plaintiff is unable to establish

14   a prima facie element for either of its claims, summary judgment for Defendants is

15   warranted.

16   **II.    STATEMENT OF FACTS**

17        **A.    Plaintiff's Mark and Products**

18        Plaintiff is the registered owner of the mark G Defy®.  Plaintiff uses that

19   mark and its distinctive logo in connection with the sale of athletic shoes that have

20   springs built into the soles.  According to Plaintiff, the springs absorb shock to

21   decrease stress on joints and propel users forward while they walk or run.

22   Plaintiff's shoes come in men's and women's sizes; they are not made for children.

23   Plaintiff primarily sells its shoes through its website and the SkyMall catalogue

24   found on airplanes.  Some of its products are sold in retail stores or through internet

25   vendors.  Plaintiff's marketing efforts include using paid advertising tied to

26   keyword searches on internet search engines, in particular when searches are

27   conducted for "g defy."  As described further below, the results of such searches

28   form the basis for this lawsuit.

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

CV13-01842 JAK (JCGX)
DEFS' MOT FOR SUMM JUDGMENT

### B.   Under Armour's Marks and Products

Defendant Under Armour designs and distributes a variety of nationally recognized sports apparel, including athletic footwear.  Under Armour is the registered owner of several trademarks for footwear that are associated with the footwear at issue including: MICRO G (U.S. Reg. No. 3901255), UNDER ARMOUR (U.S. Reg. No. 3712052 and others), UA (U.S. Reg. No. 85209107 and others), the ⊱ logo (U.S. Reg. No. 3178547 and others), and others.  Unlike Plaintiff, Under Armour does not manufacture or sell dress shoes.  Further, Under Armour does not sell shoes with springs in the soles or market its shoes as having quasi-medical benefits.  Under Armour sells a full line of athletic shoes for men, women, and children.

Since 2010, Under Armor has extensively used and promoted its Micro G® federally registered trademark.  The Micro G® mark appears on more than 600 styles of Under Armour shoes that use the Micro G technology.  UMF 1.  While Plaintiff uses its G Defy® mark on all of its athletic shoes, Under Armour uses its Micro G® mark only on certain of its running and training shoes.  UMF 2.  Under Armour chose "Defy" as a model name because it dared to "defy the industry as far as how we build product, how we build footwear here at Under Armour."  UMF 3.  Specifically, Under Armour used materials on the Defy shoe that were previously only used on its apparel, providing a competitive advantage to Under Armour.  *Id.*

Under Armour used the Defy style name on only a small subset of the running shoes with Micro G® technology, and always in conjunction with UA or Under Armour and Micro G®.  Other style names for those shoes include Defend, Gridiron, Neo Mantis, Monza, Assert IV, Pulse, Ignite, Renegade, and Toxic Six.  The naming protocol for those styles was the same as for shoes with the Defy style, i.e., UA Micro G® Defend training shoes, UA Micro G® Gridiron training shoes, men's Micro G® Neo Mantis running shoes, etc.  The "Defy" style name does not actually appear on any Under Armour shoe; the only place the style name "Defy" is

used is on the box that the shoes come in and on some websites, but it is never used without the accompanying Under Armour and Micro G® marks.  UMF 4.  Indeed, the shoe box contains 15 Under Armour marks, and the work "defy" once.  UMF 5.

Like Plaintiff, Under Armour also purchases keyword search terms through Google and other search engines.  Every search term purchased by Under Armour that includes "defy" also includes "Under Armour," "UA," and/or "Micro G," and typically also includes one or more of the terms "mens," "womens," "running shoes," or "shoes."  UMF 6.  Under Armour never used the word "defy" not in conjunction with "Under Armour" or "UA" or "Micro G," and never used the term "g defy" without "micro" immediately preceding the term.  UMF 7.  Under Armour did not purchase "g defy" by itself as a key word for search engines.  UMF 8.  The Under Armour ad displayed in response to a key word search, which is what a consumer sees, did not include the word "defy," but read "Under Armour® Micro G."  UMF 9.

### C.    <u>Involvement by Other Defendants</u>

The Defendants other than Under Armour are retail sellers of Under Armour athletic footwear, either in stores or on the internet.  They are named as defendants because they sold Under Armour Micro G® Defy shoes.  As with Under Armour, there is no evidence that any retail defendant used "defy" other than in connection with "Under Armour" and "Micro G."

### D.    <u>"Defy" is a Commonly Used Mark in the Footwear and Clothing Industries</u>

The term "defy" is commonly used in the footwear industry.  At least seven shoe manufacturers other than Plaintiff or Under Armour use or have used the term "defy" as a product identifier.  For example, Evolv Sports has a federally registered trademark on Defy® VTR, a shoe designed for rock climbing, while K-Swiss has a registered mark for Defier® tennis shoes.  Other shoe manufacturers that use the term Defy include Nike (Air Max Defy running shoes), DVS (Defy skate shoes),

Draven (Defy shoes), Dublin (Defy boots), and Easy Spirit (women's Defy ankle boots). More than 100 years ago, Florsheim obtained a trademark for its Wet-Defi Waterproof shoe, which was first used in 1895. UMF 10.

Athletic clothing manufacturers have also registered multiple trademarks with the term "defy" or close derivatives. The following registered marks are readily found when shopping for athletic apparel: i Defy®, Defye®, Dare to Defy®, Defy Insanity®, Defy All Boundaries®, Defy All Odds Apparel®, Defy Definition®, and Defier®, to name a few. UMF 11. DEFY Clothing sells its skatewear products on the internet and elsewhere, as do Defyant Clothing (selling shirts and other products with the mark DFYNT), Defy All Odds Apparel, and Defy Wear, among others. UMF 12. These marks are not registered by Plaintiff or Under Armour. The fact that the term "defy" is so common in the relevant market show that Plaintiff's mark is weak, a key element in determining confusion, as explained below.

### E.   Surveys Show that 98%-99% of Consumers Have Never Even Heard of Plaintiff or Plaintiff's Products

Although Under Armor did not purchase "g defy" as a keyword, the Under Armour paid ad was sometimes triggered by a search for "g defy."[1]  As such, after becoming aware of this issue after this lawsuit was filed, Under Armour commissioned an analysis to determine whether there was any possibility for consumer confusion from such search results.

The analysis started with a determination of the public awareness of Plaintiff's G Defy® mark. Of the 512 persons who participated in the survey, only

---

[1] Search engines like Google can use "broad match" criteria to display an ad even if the searched term was not a term bid on by the advertiser. See generally *FragranceNet.com, Inc. v. Les Parfums, Inc.*, 672 F. Supp. 2d 328, 331 (E.D.N.Y. 2009) ("When an advertiser bids on a "broad match," its link will appear when a search is conducted for that keyword, its plural forms, its synonyms, or phrases similar to the word."); *1-800 Contacts, Inc. v. Lens.com, Inc.*, 755 F. Supp. 2d 1151, 1158-59 (D. Utah 2010) aff'd in part, rev'd in part, 722 F.3d 1229 (10th Cir. 2013) (same).

five, or 1.0%, had ever even heard of G Defy® as a brand of athletic shoe. UMF 13. Thus, the pool of persons who could *possibly* be confused is no more than 1.0% of consumers. Among prospective purchasers of athletic shoes, only five out of 336 persons, or 1.5%, were aware of G Defy, while only 0.9% of prospective purchasers of athletic shoes for protecting joints from impact (1 out of 108) were aware of G Defy. UMF 14. Comparable results were found when a separate group of 578 persons were asked if they were aware of Gravity Defyer as a brand of athletic shoe. Only eight, or 1.4%, answered affirmatively. UMF 15. *None* of those eight persons was able to identify G Defy as a brand of shoe sold by Gravity Defyer. *Id.*

It is notable that consumer awareness of Plaintiff's brand is comparable to recognition of a *non-existent* brand used in the survey for control purposes. While only five of the 512 persons who participated in the survey had ever heard of G Defy® as a brand of athletic shoes, three persons claim to have heard of the fictional brand Zubov. As noted by the expert who conducted the survey, "the percentage of respondents who were aware of G Defy did not even exceed the supposed awareness of a fictional brand by a meaningful margin (1.0% compared to 0.6%)." Anderson Decl., Ex. H, at 10.

### F. Plaintiff's Claims Arise Exclusively from Alleged Results of Internet Searches for "G Defy"

Plaintiff claims that when "g defy" is entered as an internet search term, consumers are distracted because the Under Armour product is included in the search results, which caused potential consumers to visit other websites. *See, e.g.,* ECF Docket No. 47, at 2 ("Plaintiff ... contends that [Defendants use] 'Micro G Defy' for shoes, caused consumers to be confused, at least initially, when they entered 'G Defy' as an internet search term .... Plaintiff contends it was damaged by diverted sales, in that when consumers responding to its advertising were looking for 'G DEFY' online in searches on Google, Yahoo or Bing many listings

for Defendants appeared and consumers were instead diverted to Defendants ….”); ECF Docket No. 44, at 3 (“Customers who saw Gravity Defyer's print ads, and went to the Internet to find more information or place an order, and typing in ‘g defy’ were presented with a list of search results dominated by Defendants’ Micro G Defy ads ….”); Anderson Decl., Ex. M (Wallace Tr., 80:1-24 (“if you have a search results page, you have real estate on that page …. So if you – so when a search result on, for instance, ‘G-defy’ displays ads and search results and product listings and all sorts of things on multiple web pages, multiple products, it splits the traffic.”)). But Plaintiff has no evidence that *any* consumers clicked on a link to Under Armour Micro G Defy running shoes in the results of a search for “g defy.” UMF 16. Plaintiff thus necessarily does not have any evidence that any consumer was confused by the mere presence of Under Armour Micro G Defy running shoes on the same results page of an internet search for “g defy.”

Plaintiff has paid for keyword advertising with the major search engines. As such, any time someone searches “g defy” – one of Plaintiff's paid search terms – a link to Plaintiff's website appears at the top of the results displayed. UMF 17.

Followed thereafter are other ads for Plaintiff's shoes, and then a non-paid link to Plaintiff's website, the result of the organic search. Further down the page are often links to (a) Under Armour and (b) retailers who sell either Gravity Defyer shoes or Under Armour Micro G Defy running shoes. *Id.* The results are confirmed from Plaintiff's own production, a sample of which follows:

There is no evidence that any internet search for "g defy" ever produced results where the Under Armour Micro G Defy running shoes appeared *above* either Plaintiff's paid ad or organic search results for Plaintiff's products. And each time that Under Armour shoes were displayed, they were labeled as such. Further, it is notable how few consumers even clicked on the Under Armour ad that appeared when a keyword search was conducted. Over the five-month period at the ad appeared, the multiple keyword terms used by Under Armour triggered only 187 clicks from 8,579 impressions, a click rate of less than 2.2%. UMF 18. Those 38 clicks per month were on an ad that never included the term "defy." UMF 9.

## III.   STANDARD FOR SUMMARY JUDGMENT

Summary judgment must be granted where "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed.R.Civ.Proc. 56(c).

Likelihood of confusion is sometimes considered to be a fact question. However, where, as here, "no 'rational trier of fact' could find that a likelihood of

1    confusion is 'probable,' the Court may grant summary judgment for the party

2    accused of infringement." *Sand Hill Advisors, LLC v. Sand Hill Advisors, LLC,*

3    680 F. Supp. 2d 1107, 1118 (N.D. Cal. 2010)*, citing M2 Software, Inc. v. Madacy*

4    *Entm't,* 421 F.3d 1073, 1085 (9th Cir. 2005).  That is what is requested here.

5    **IV.   ARGUMENTS**

6        **A.   Issues To Be Decided**

7        Plaintiff asserts two federal claims, for trademark infringement and unfair

8    competition.  *See* ECF 68.  Plaintiff must prove the same elements for both claims:

9    (a) "G Defy" is a valid, protectable, and registered trademark owned by Plaintiff;

10   (b) Defendants used a mark similar to the G Defy mark in commerce; and (c)

11   Defendants used Plaintiff's mark or a similar mark in a manner that is likely to

12   cause confusion, mistake, or deception among ordinary consumers as to the source,

13   sponsorship, affiliation, or approval of the subject product.  *See* Ninth Circuit

14   Manual of Model Civil Jury Instructions, § 15.5 (2010); 15 U.S.C. § 1114.[2]

15       Defendants do not dispute that Plaintiff owns and has a federal registration

16   for the G Defy® mark, and assume for purposes of this motion that the mark is

17   valid and protectable.  The issues to be addressed by the Court are whether (a)

18   Defendants used the G Defy® mark or a similar mark and (b) such use is likely to

19   cause confusion among consumers who review the results of an internet search for

20   "g defy."

21       **B.   Defendants Do Not Use Plaintiff's Mark or a Similar Mark**

22       The Defendants never used "G Defy" mark, period.  There is no Under

23   Armour G Defy shoe.  The undisputed evidence is that one class of Under

24

25   [2] *Philip Morris USA Inc. v. Liu,* 489 F.Supp.2d 1119, 1121-22 (C.D. Cal. 2007) ("claims … under Sections 32 and 43(a) of the Lanham Act … are distinct claims [but] the elements are essentially identical.…  Liability is established under both Section 32 and Section 43(a) if the plaintiff demonstrates (1) it owns a valid and protectable trademark, and (2) the defendant used in commerce a similar mark without authorization in a manner likely to cause consumer confusion, deception, or mistake"), *citing Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.* 174 F.3d 1036, 1046 nn. 6, 8 (9th Cir. 1999)).

26

27

28

1   Armour's footwear contains its Micro G® technology, and that one style of its

2   footwear that contains Micro G® technology was branded with a product name

3   incorporating the term "Defy."  Only when the full name of the Under Armour

4   product was placed on a shoe box – never on a shoe itself – does the "Micro G"

5   name come in proximity with "Defy."  Under Armour does not use the letter "G"

6   other than in connection with the mark Micro G®, and does not use the term "G

7   Defy" as a product identifier.  UMF 7.  The full product name – Under Armour

8   Micro G® Defy – does not as a matter of law constitute "use" of Plaintiff's G

9   Defy® mark.

10       In *Walter v. Mattel, Inc.*, 210 F.3d 1108, 1111 (9th Cir. 2000), plaintiff, a

11  commercial illustrator, did business as "Pearl Beach," with a stylized scallop shell

12  with a pearl in the center.  Plaintiff was unknown to defendant Mattel when Mattel

13  started marketing a "Pearl Beach Barbie."  Mattel performed a trademark search

14  and found no conflicting uses for "Pearl Beach."  When Plaintiff learned of the

15  Barbie product, she sued, claiming that Mattel's use of her trade name was a

16  violation of the Lanham Act.  The Ninth Circuit agreed that the district court

17  correctly found plaintiff's products (commercial art) were not complementary with

18  Mattel's (dolls)  or sold to the same class of purchasers, reducing the prospect for

19  confusion, and that Mattel did not use plaintiff's mark.

20       The term "Pearl Beach" in Mattel's products never appears alone;
         rather, it is invariably accompanied by a reference to Barbie,
21       which is clearly the "salient part of the mark indicative of the
         product's origin." *Sleekcraft*, 599 F.2d at 351.  In other words,
22       "Barbie" is the dominant part of the "Pearl Beach Barbie" mark.

23  *Id.*  The same is true here, where the term "Defy" in Under Armour's products

24  never appears alone; rather, it is invariably accompanied by a reference to Under

25  Armour Micro G®.  *See also Nora Beverages v. Perrier Group of America*, 269

26  F.3d 114, 122-23 (2d Cir. 2001) (likelihood of confusion over similarly shaped

27  bottles used by competing bottled water companies can be negated by "the presence

28

Arent Fox LLP
Attorneys At Law
Los Angeles

- 10 -

CV13-01842 JAK (JCGX)
DEFS' MOT FOR SUMM JUDGMENT

of the prominent and distinctive labels" of the respective companies; summary judgment affirmed).

The only way that Plaintiff can establish Under Armour's "use" of the G Defy mark is to parse the "G" from UA's Micro G® mark and attach it to the Defy style, in a manner never performed by Under Armour or any of the Defendant retailers. As part of a trademark infringement inquiry, no such parsing is permitted. *See Universal City Studios, Inc. v. Nintendo Co., Ltd.,* 746 F.2d 112, 117 (2d Cir. 1984) ("Each syllable of each mark generates an 'impact,' but the only impact to be considered is that of the whole." [Citation omitted]); *Fuji Jyukogyo Kabushiki Kaisha v. Toyota Jidosha Kabushiki Kaisha,* 228 U.S.P.Q. 672, 674 (TTAB 1985) (consumers are not expected to "count letters when reacting to trademarks in the marketplace"); *Marker Int'l v. deBruler,* 635 F.Supp. 986, 1002 (D.Utah 1986), *aff'd* 844 F.2d 763 (10th Cir. 1988) (the public does not and is not expected to study marks). When viewed as a whole and in context, it is apparent that Under Armour does not use Plaintiff's G Defy mark. *See Savin Corp. v. Savin Group,* 391 F.3d 439, 458 (2d Cir. 2004) ("the 'impression' conveyed by the setting in which the mark is used is often of critical importance.")

Nor does Under Armour use a confusingly similar mark. Rather, the only time "Defy" appears with Under Armour is in connection with and proximate to Under Armour or UA, and then following the Micro G® mark. UMF 7. Customers are not confused that the Micro G® Defy is promoted and sold by Under Armour.

### C.   **Plaintiff Cannot Establish A Likelihood of Confusion**

#### 1.   **The pertinent *Sleekcraft* factors confirm that there is no likelihood of confusion.**

Even if the Under Armour Micro G® Defy product name is considered to be a use of Plaintiff's mark or a similar mark, Plaintiff must still establish a likelihood of confusion among consumers. Plaintiff cannot make such a showing.

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

CV13-01842 JAK (JCGX)
DEFS' MOT FOR SUMM JUDGMENT

1    The test for likelihood of confusion is whether a " 'reasonably prudent
2    consumer' in the marketplace is likely to be confused as to origin of the good or
3    service bearing one of the marks." *Dreamwerks Productions Group, Inc., v. SKG*
4    *Studio*, 142 F.3d 1127, 1129 (9th Cir. 1998).  "Unless prospective purchasers … are
5    confused there is … no cause of action." *Rearden LLC v. Rearden Commerce, Inc.*,
6    683 F.3d 1190, 1214 (9th Cir. 2012).  Here, Plaintiff confirms that the marketplace
7    is consumers looking to purchase Gravity Defyer shoes, and who do so by using the
8    term "G Defy" in internet searches.  UMF 19, 20.

9    Courts in the Ninth Circuit use the eight *Sleekcraft* factors as a starting point
10   to determine if there is a likelihood of confusion between two marks.  *Walter v.*
11   *Mattel, Inc.*, 210 F.3d 1108, 1111 (9th Cir. 2000).  The *Sleekcraft* factors are:  (a)
12   Strength of the mark; (b) Proximity or relatedness of the goods; (c) Similarity of the
13   marks; (d) Evidence of actual confusion; (e) Marketing channels; (f) Type of goods
14   and degree of purchaser care; (g) Intent in selecting mark; and (h) Likelihood of
15   expansion.  *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979).
16   This is a partial list of factors relevant to determining the likelihood of consumer
17   confusion.  *Network Automation, Inc. v. Advanced Systems Concepts, Inc.*, 638 F.3d
18   1137, 1142, 1149 (9th Cir. 2011) ("the *Sleekcraft* factors (1) are non-exhaustive,
19   and (2) should be applied flexibly, particularly in the context of Internet
20   commerce.").  The weight of each factor is based on its relevance to the facts.  *Id.* at
21   1149.

22   In a trademark case alleging infringement in the context of an internet search
23   results page, the Ninth Circuit clarified that "the most relevant factors to the
24   analysis of the likelihood of confusion are:  (1) the strength of the mark; (2) the
25   evidence of actual confusion; (3) the type of goods and degree of care likely to be
26   exercised by the purchaser; and (4) the labeling and appearance of the
27   advertisements and the surrounding context on the screen displaying the results
28   page." *Id.* at 1154.

1        All four of the *Network Automation* factors that are critical in the context of

2    internet search results weigh in favor of Defendants.

3            **a.    Plaintiff's mark is weak.**

4        G Defy is a weak mark, recognized by at most only 1.5% of relevant

5    consumers.  UMF 14.  Consumer surveys are "ample and legitimate evidence" in

6    trademark cases.  *Levi Strauss & Co., v. Blue Bell, Inc.,* 778 F.2d 1352, 1360 (9th

7    Cir. 1985).  The survey evidence here powerfully demonstrates that the G Defy

8    mark has less than even a modicum of strength.

9        Moreover, "defy" is a commonly used term in the athletic shoe and sports

10   clothing fields.  As outlined above, there have been no fewer than 11 registrations,

11   other than Plaintiff's, for "defy" with and without other letters or words in

12   connection with shoes and clothing.  UMF 10, 11.  This includes registrations that

13   have existed since at least 1909.

14       While trademarks are not to be dissected, a weak portion of a mark is given

15   less weight.  See *Glow Industries, Inc. v. Lopez,* 273 F.Supp.2d 1095, 1123 (C.D.

16   Cal. 2003).  One using a term that is commonly used in a field lacks significant

17   ability to prevent its use by others.  *Halo Management, LLC, v. Interland, Inc.,* 308

18   F.Supp.2d 1019, 1034 (N.D. Cal. 2003) ("In the trademark world, the word 'halo' is

19   a popular one [that] appears in dozens of places, many 'in a field which at least

20   broadly would include or be related to plaintiff's business.'" [Citation omitted]).

21   Consumers are not likely to be confused when the marketplace is replete with

22   products using the same word.  *Sand Hill Advisors,* 680 F.Supp.2d at 1119 ("Where

23   the market is inundated by products using the particular trademarked word, there is

24   a corresponding likelihood that consumers 'will not likely be confused by any two

25   in the crowd.'"); *Miss World (UK) Ltd. v. Mrs. America Pageants,* 856 F.2d 1445,

26   1449 (9th Cir. 1988) (where similar marks are on similar goods each cannot be

27   distinctive; "customers are not likely to be confused between any two of the crowd

28   and may have learned to carefully pick out one from the other.")

1    For these reasons, the G Defy mark is weak and part of a crowded field of

2    similar marks, thereby reducing the prospects of consumer confusion.

3    **b.    There is no evidence of actual confusion.**

4    Evidence of actual confusion is often the most important factor in internet

5    cases. *Network Automation*, 638 F.3d at 1147.  Plaintiff has offered no credible or

6    admissible evidence of actual confusion from the internet search results.

7    Plaintiff asserts that it received one phone call asking if Under Armour is

8    selling G Defy shoes.  Anderson Decl., Ex. A (Elnekahveh Tr. 82:20-83:2).  The

9    information is double hearsay – a consumer spoke to a call center person, who

10   reported to it another employee.  Plaintiff has not come forward with any evidence

11   that proves actual confusion.  For purposes of this motion only, Defendants can

12   assume the call was received, for one call alone does not indicate or establish

13   confusion.[3]  Asking if two companies are related may well indicate an

14   understanding that the companies and their products are not related.  *See, e.g., Nora*

15   *Beverages,* 269 F.3d at 124 ("Inquiries about the relationship between an owner of

16   a mark and an alleged infringer do not amount to actual confusion.  Indeed, such

17   inquiries are arguably premised upon a *lack* of confusion between the products such

18   as to inspire the inquiry itself.").

19   As a matter of law, one phone call is *de minimis*.  Plaintiff receives 3,500 to

20   4,200 or more calls per week.  UMF 21.  One phone call in a year, of over 180,000

21   calls, is undeniably *de minimis*.  *Nutri/Sys., Inc. v. Con-Stan Indus., Inc.*, 809 F.2d

22   601, 606 (9th Cir. 1987).  Even if this one call could be seen to reflect actual

23   confusion, such *de minimis* evidence of "confusion" is to be disregarded.  *Universal*

24   *Money Centers, Inc. v. American Tel. & Tel. Co.*, 22 F.3d 1527, 1535 (10th Cir.

25   1994) ("Evidence of actual confusion of a very limited scope may be dismissed as

26

27   _____

     [3]  Plaintiff produced a customer contact database, but no such inquiry could be found, and
28   Plaintiff does not keep records of calls from potential customers.  Anderson Decl., Ex. A
     (Elnekahveh Tr., 85:11-14.)

1  de minimis…. De minimis evidence of actual confusion does not establish the

2  existence of a genuine issue of material fact regarding likelihood of confusion….");

3  *Nora Beverages*, 269 F.3d at 124 (same).

4      Further, Plaintiff has not produced any evidence that any consumers (a)

5  actually entered "G Defy" as an internet search term, (b) viewed search results after

6  entering "G Defy" as a search term, or (c) clicked on "Under Armour Micro G

7  Defy" products in those search results.  The number of people that clicked is the

8  most that could have been confused.  *1-800 Contacts, Inc.*, 722 F.3d at 1244 (no

9  confusion proven where evidence showed only that users clicked Defendant's ads,

10  not the reasons they selected the ads, which could have been due to confusion or a

11  desire to look at a competitor's offerings).

12      There is no dispute that some consumers bought the Under Armour Micro

13  G® Defy footwear through the internet from several Defendants' websites.  There

14  is, though, no evidence that any consumer entered "G Defy" as the search term that

15  initiated the process, let alone that any consumers clicked on "Under Armour Micro

16  G® Defy" in the search results because they were confused.  UMF 16.

17      Plaintiff has produced no admissible evidence of actual confusion, so this

18  factor weighs in favor of Defendants.

19          **c.  Given the specialized goods offered by Plaintiff,
              purchasers are likely to exercise a high degree of
20            care.**

21      All versions of Plaintiff's shoes (men's sports shoes, dress shoes, work boots,

22  loafers, sandals, and others, and women's sports shoes, boots, sandals, flats, and

23  others) contain springs in the soles that purport to act as shock absorbers and

24  provide propulsion for easier forward movement.  Plaintiff claims that its shoes can

25  "relieve discomfort," "improve your health," and "energize your life."  UMF 22.

26  Plaintiff's shoes are thus designed for customers with specialized needs, such as

27  persons who cannot wear ordinary shoes without pain or stress.

28

1    The market for such specialized products is both narrow and reliant on a

2  knowledgeable customer base, reducing the prospect for confusion.

> [T]he consumers relevant to this suit are looking for a particular
> retailer.  Presumably they have narrowed their search because
> they have already selected 1-800 [Contacts] as the preferred
> retailer and are searching for its website or perhaps commentary
> on its performance.  Given the purpose of the search, the
> *shoppers will be attentive to click on those results that will
> connect them with sites relating to 1-800 [Contacts].*

7  *1-800 Contacts Inc.,* 722 F.3d at 1244-45 [emphasis added].

8    The same is true of Plaintiff's G Defy shoes.  Unlike Plaintiff, Under Armour

9  does not claim that its shoes provide any quasi-medical benefits.  UMF 23.  There

10  are other notable differences between Plaintiff's shoes and Under Armour's.

11  Plaintiff does not sell shoes in children's sizes, while Under Armour does.  Under

12  Armour does not sell dress shoes like Plaintiff does.  Under Armour does not sell

13  shoes with springs.  UMF 24.  All of these differences make it far less likely that

14  consumers seeking G Defy shoes with springs will be confused if they see a

15  reference to Under Armour's dissimilar products.

16    Purchasers who need specialized products necessarily take extra care to find

17  them on the internet.  As a basic proposition, internet shoppers are careful.

> [T]he default degree of consumer care is becoming more
> heightened as the novelty of the Internet evaporates and online
> commerce become commonplace. ...  '[c]onsumers who use the
> internet for shopping are generally quite sophisticated about such
> matters.'  ...  '[R]easonable, prudent and experienced internet
> consumers are accustomed to ... exploration by trial and error.
> ...  They fully expect to find some sites that aren't what they
> imagine based on a glance at the domain name or search engine
> summary. ...  [C]onsumers don't form any firm expectations
> about the sponsorship of a website until they've seen the landing
> page – if then.'

24  *Network Automation,* 638 F.3d at 1152-53 (citations omitted).

25    To support its position, Plaintiff must overlook the fact that people who

26  search specifically for its product already know enough about the product to

27  conduct such a focused search.  Plaintiff admits that consumers who use "G Defy"

28  as a search term are looking for Plaintiff's products.  UMF 19.  Those people have

already selected Plaintiff's G Defy® shoes as the product they are looking for. Shoppers will be attentive to click on those results that will connect them with sites relating to the product and ignore the rest.  They will not expect that an "Under Armour" site will sell Plaintiff's G Defy® shoes.

> Perhaps in the abstract, one who searches for a particular business with a strong mark and sees an entry on the results page will naturally infer that the entry is for that business.  But that inference is an unnatural one when the entry is clearly labeled as an advertisement and clearly identifies the source, which has a name quite different from the business being searched for.  It is for this reason that the Ninth Circuit considered "the labeling and appearance of the advertisements and the surrounding context on the screen displaying the results page" to be a critical factor in finding no likelihood of confusion in a case in which the alleged infringer used a competitor's mark as a keyword.

*1-800 Contacts,* 722 F.3d at 1245 (citation omitted).

This stands in contrast to someone who has never heard about Plaintiff's products, and simply performs a casual search for "athletic shoes" or "comfortable shoes."  Each of those searches results in millions of hits, and Plaintiff's products would likely be buried among those results but for its paid ads.  In contrast, when a person searches for "G Defy," Plaintiff's products appear first not only among the paid ads, but also among the organic results.  UMF 17.

Within the generic category of shoes, Plaintiff's product has a specific purpose of relieving pain and discomfort.  Common sense and experience teaches that pain – particularly the avoidance of pain – is a great incentive.  People who want shoes that alleviate pain are likely to be attentive to that aspect and exercise an elevated level of care when shopping.  For these reasons, this factor weighs heavily in Defendants' favor.

### d.   There is no likelihood that consumers could be confused when presented with the clearly labeled search results.

"Consumer care is becoming more heightened as the novelty of the internet evaporates and on line commerce become commonplace." *Network Automation,* 638 F.3d at 1152.  Internet consumers are not confused by listings in search results.

> [R]easonable, prudent and experienced internet consumers are accustomed to such exploration by trial and error. They skip from site to site, ready to hit the back button whenever they're not satisfied with a site's contents. They fully expect to find some sites that aren't what they imagine based on a glance at the domain name or search engine summary. Outside the special case of ... domains that actively claim affiliation with the trademark holder, consumers don't form any firm expectations about the sponsorship of a website until they've seen the landing page – if then.

*Id.* at 1152-53 (Citation omitted). A consumer is not confused as to source or affiliation when he or she "knows or should know from the outset that a product or web link is not related to the trademark holder because the list produced by the search engine informs him." *Playboy Enters., Inc. v. Netscape Commc'ns Corp.*, 354 F.3d 1020, 1034-35 (9th Cir. 2004) (Berzon, J. concurring).

In the internet search results on which Plaintiff's claims are based, the Under Armour product listings are all clearly labeled as being Under Armour products. UMF 17.

The fact that traffic to Plaintiff's website might have decreased is irrelevant, can be the result of multiple factors entirely unrelated to Defendants' conduct, and at most constitutes non-actionable diversion. Plaintiff must demonstrate likely confusion, not merely diversion. *Network Automation,* 638 F.3d at 1149.

The absence of any likelihood of confusion – a necessary element of Plaintiff's two claims – should end this case with judgment in Defendants' favor.

## 2. **Any initial interest confusion does not result in liability for Defendants.**

Plaintiff is unable to establish initial interest confusion, for there is no reasonable possibility that a consumer would confuse the owner of Plaintiff's mark when it is merely a fortuitous part of "Under Armour Micro G® Defy."

Plaintiff claims initial interest confusion among consumers who use "g defy" as an internet search term. ECF Docket No. 47, at 2. "[B]ecause the *sine qua non* of trademark infringement is consumer confusion, when we examine initial interest

confusion, the owner of the mark must demonstrate likely confusion, not mere diversion." *Network Automation*, 638 F.3d at 1149.  Initial interest confusion "occurs when the defendant uses the plaintiff's trademark 'in a manner calculated to capture initial consumer attention, even though no actual sale is finally completed as a result of the confusion.'" *Nissan Motor Co. v. Nissan Computer Co.*, 378 F.3d 1002, 1018 (9th Cir. 2004).

Listings in a search result are not evidence of likelihood of confusion, initial interest or otherwise.  When a consumer sees clearly labeled listings such as Under Armour Micro G® Defy and similar iterations showing Under Armour is the source of the product, the consumer is not misled or confused.  Clear labeling, such as that in the present case, eliminates the likelihood of initial interest confusion.  *Network Automation*, 638 F.3d at 1153-54; *Walter v. Mattel,* 210 F.3d at 1111; *Nora Beverages v. Perrier*, 269 F.3d at 122.

"[I]t would be wrong to expand the initial interest confusion theory of infringement beyond the realm of the misleading and deceptive to the context of legitimate comparative and contextual advertising." *Network Automation,* 638 F.3d at 1148.  By contrast, Plaintiff here seeks to expand initial interest confusion to the mere existence of search results generated by a third-party search engine.

Courts have likened searching the internet to shopping in a department store that carries goods from different sources. *Id.* ("Judge Berzon [in *Playboy v. Netscape*, 354 F.3d at 1034-36] analogized the experience of browsing clearly labeled keyword advertisements to shopping at Macy's"). In *Playboy*, Judge Berzon stated:

> [S]uppose a customer walks into a bookstore and asks for Playboy magazine and is then directed to the adult magazine section, where he or she sees Penthouse or Hustler up front on the rack while Playboy is buried in back.  One would not say that Penthouse or Hustler had violated Playboy's trademark.  This conclusion holds true even if Hustler paid the store owner to put its magazines in front of Playboy's.
>
> One can test these analogies with an on-line example: If I went to Macy's website and did a search for a Calvin Klein shirt, would

1      Macy's violate Calvin Klein's trademark if it responded (as does
2  Amazon.com, for example) with the requested shirt and pictures of
    other shirts I might like to consider as well? I very much doubt it.

3  354 F.3d at 1035 (Berzon, J. concurring).

4      Plaintiff adopts a similar analogy, likening shopping on the internet to

5  shopping in a mall.  Anderson Decl., Ex. A (Elnekaveh Tr., 107:15-108:11.)

6  Plaintiff contends it is a small store in a mall that houses several much larger stores.

7  Plaintiff asserts that while it has invited customers to its store, larger stores – the

8  Defendants – stand in front of Plaintiff's store and distract consumers to go

9  elsewhere. *Id.*

10      Plaintiff's analogy is false, for the size of the stores is irrelevant to the

11  required analysis, and none of the Defendants obstruct either the view of or access

12  to Plaintiff's products.  Rather, a consumer who sees Plaintiff's products on the

13  internet is also exposed to, and has the ability to compare, products sold by others.

14  This is no different than a consumer who walks into a mall and sees multiple stores

15  selling multiple competing products, all while standing directly in front of

16  Plaintiff's store.  Such conduct is the heart of competition and free enterprise, and is

17  patently not actionable.

18      Here, when there is a search for "G Defy," the search engine does not take

19  the consumer to a Defendant's web site.  Instead, the search engine displays a list

20  from which the consumer may make that choice – just as a consumer in a mall may

21  choose to visit Macy's instead of FootLocker upon seeing a Macy's display in the

22  mall common area or outside the FootLocker store.

23      Recently, the Tenth Circuit described how Google displays search results:

24      [A] typical Google search simultaneously yielded two different kinds
    of results: organic results and sponsored links.  Organic results were
25      the links generated by Google's search algorithms, which sorted web
    pages according to their relevance to the user's search as well as their
26      quality.  An advertiser could not pay Google to have its web page
    displayed among the organic results.  Through AdWords, however, an
27      advertiser could pay to be displayed as a sponsored link.  A sponsored
    link would include advertising copy and the advertiser's website
28      address.

1       A user who clicked on the ad would be connected to the website.
2     Sponsored links usually appeared either above or to the right of the organic results.  The notice "Sponsored Links" was displayed next to each cluster of ads.  Google placed background shading behind several
3    of the sponsored links to set them apart visually from the organic results, which appeared on a plain white background.

4

5       For its ad to appear as a sponsored link when a user initiated a Google search, an advertiser had to bid to reserve a particular word or phrase –
6    known as a keyword – that would trigger the display of its ad.  The advertiser specified whether its ad should appear as the result of (1) a
7    broad match – that is, whenever a Google search contained a phrase that was either similar to or a relevant variation of the keyword; (2) a
8    phrase match – whenever the search contained the exact keyword; or (3) an exact match—whenever the search contained the exact keyword
9    and nothing more.  …

10      The display of a sponsored link in response to a user's search was known as an impression.  An advertiser paid Google only if the user
11   actually clicked on its impression; its bid for the keyword represented the amount per click that it was willing to pay.  …

12   *1-800 Contacts*, 722 F.3d at 1235-36.

13        Under Armour had a sponsored link that was displayed when various

14  keywords were searched.  Those keywords were "Micro G Defy" either alone or

15  with additional words; "G Defy" by itself was *not* one of the keywords.  UMF 7, 8.

16        Regardless, a consumer never sees the keywords used for advertising.  *1-800*

17  *Contacts*, 722 F.3d at 1242-43.  The Under Armour ad that was displayed, which is

18  what a consumer sees, did not include the word "defy" at all, but instead read Under

19  Armour® Micro G.  UMF 9.  That ad does not infringe under any analysis.  As

20  such, Plaintiff can only be complaining about organic search results, meaning that

21  Plaintiff's real complaint is that third-party search engines provide more listings

22  than Plaintiff prefers.

23        Further, as discussed above, the number of actual clicks on an Under Armour

24  ad when certain key words were searched is but a small fraction of the times that

25  searches were run.  When those results are combined with the fact that only a small

26  percentage of consumers is even aware of Plaintiff's mark, the maximum number of

27  consumers who could be potentially confused is far below 2%.  UMF 13, 14, 15.

28

1    In *1-800 Contacts Inc.*, 722 F.3d at 1244, only 1.5% of the people who saw

2    an ad (impressions) actually clicked on it.  Initial interest confusion could thus

3    occur at most 1.5% of the time that a Lens.com ad was generated.  The Court held

4    that a 1.5% maximum *potential* level cannot support a likelihood of confusion.  *Id.*

5    The maximum *potential* confusion rate here is equally minimal, for there

6    simply is limited consumer recognition of Plaintiff's mark.  A survey showing such

7    a low confusion rate confirms there is no likely confusion.  *Carefirst of Maryland,*

8    *Inc. v. First Care, P.C.*, 434 F.3d 263, 268 (4th Cir. 2006) (A survey that "only

9    shows a confusion rate of 2 percent, [is] hardly a sufficient showing of actual

10   confusion"); *Brockmeyer v. Hearst Publishing Corp.,* 248 F.Supp.2d 281, 298

11   (S.D.N.Y. 2003) (survey showing less than 3% of respondents seeing any

12   connection between the parties is not sufficient to demonstrate likelihood of

13   confusion); *IDV North America v. S&M Brands, Inc.*, 26 F.Supp.2d 815, 831-32

14   (E.D. Va. 1998) (confusion rate of 2.4% of respondents is not a sufficient showing

15   of likelihood of confusion—"That result, standing alone, is persuasive evidence that

16   there is very little likelihood of confusion between the marks here at issue."  Rather,

17   a low rate "prove[s] the absence, rather than the presence, of likely confusion.")

18   Even a 7.6% confusion rate weighs against infringement.  *1-800 Contacts*,

19   722 F.3d at 1248 (citing *Henri's Food Products Food Co., Inc. v. Kraft Foods, Inc.*,

20   717 F.2d 352 , 358 (7th Cir. 1983)).  "Survey evidence clearly favors the defendant

21   when it demonstrates a level of confusion much below ten percent."  *Sara Lee v.*

22   *Kayser-Roth Corp.*, 81 F.3d 455, 467 n.15 (4th Cir.1996), citing *Henri's Food.*

23   No matter how many times the Under Armour product appeared in search

24   results, if few people clicked on it, there is no evidence of a likelihood of confusion.

25   Plaintiff has not come forward with any admissible evidence that any consumer

26   clicked on a link to the Under Armour Micro G® Defy product in the results of a

27   search of "G Defy," so Plaintiff cannot meet its burden on summary judgment.

28

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

## V.    CONCLUSION

Plaintiff's theory that customers are likely to be confused between two different products with similar elements in their names lacks not only factual support, but credulity.  All evidence confirms that the Under Armour product is clearly labeled – both on the shoe box and in internet search results – as being from Under Armour.

The crux of this case is that Plaintiff does not want consumers who use search engines to be presented with choices, regardless of dissimilarities between products and marks.  Plaintiff does not like that Under Armour's products appear in certain search results, even though neither Under Armour nor the retail defendants used Plaintiff's G Defy mark or a similar mark on their products.  Plaintiff needs to parse the Under Armour mark because it knows there is no evidence of confusion among consumers.  Plaintiff is not, though, legally permitted to parse Under Armour's mark to create a new, never intended mark.

In light of the heightened degree of consumer care in connection with internet searches, in particular when consumers search for specific products by name, no reasonable fact finder could conclude that consumers are likely to be confused.  Accordingly, judgment should be entered for each Defendant.

Dated:   April 22, 2014            **ARENT FOX LLP**


By: /s/ Jerrold Abeles
      ALLAN E. ANDERSON
      JERROLD ABELES

Attorneys for Defendants
UNDER ARMOUR, INC.; FINISH LINE, INC.;
FOOT LOCKER, INC.; NORDSTROM, INC.;
DICK'S SPORTING GOODS, INC.; CHAMPS
SPORTS; SPORT CHALET, INC.; ZAPPOS IP,
INC.; BACKCOUNTRY.COM, INC.; ROGANS
SHOES, INC.; ROAD RUNNER SPORTS
RETAIL, INC.; MONKEYSPORTS, INC.;
HOLABIRD SPORTS, LLC; EASTBAY, INC.